Good morning. May it please the court, my name is Niles Illick and I represent the appellant Dr. Mark Gibbs. Our brief presents two issues. The first challenge is the sufficiency of the evidence and the second goes to the jury charge. I'd like to turn first and very quickly to the sufficiency issues before I discuss what I think is the more substantive issue of the problems with the jury charge. Our first issue is the lack of evidence to support count one, the conspiracy to commit health care fraud. The argument here in summary is that the government simply didn't establish that Dr. Gibbs agreed to commit health care fraud. There was no evidence that he knowingly participated in a scheme to place patients into hospice when they were not hospice appropriate. The case we analogize to is Hamilton. Hamilton is a different case in our mind because in Hamilton the evidence was clear that appellant knew that the patients did not qualify for home health care. And the distinction that exists between Hamilton and this case is that it was very clear in Hamilton that the patients were not home bound, the requirement for home health care, where the requirement to put someone into hospice is much more discretionary. Now this court is well aware that you don't have to have a formal agreement in order to have the conspiracy. You can look to a concert of action, but I think when the court looks to the briefing and to the record, it should be clear that there was none of that. Now the government relies on the argument, the testimony from Melanie Murphy, but the statements there do not establish that Dr. Gibbs knowingly participated in a scheme where he knew the patients were certified for hospice when it was inappropriate. Turning to our second issue, and that is the no evidence of counts five and six for health care fraud. And this is perhaps the hardest issue for me to argue to you today because SD's case is so sad and truly evocative. The facts are just awful. But that really isn't the test. The test is really whether the jury had a rational basis to decide whether Dr. Gibbs signed the forms and whether the forms were submitted to Medicare. Now having reviewed the brief and the record in preparation for argument today, I think I probably have to concede that Agent Griffith's testimony was enough to show that Dr. Gibbs signed the forms. I think I need to make that concession to the court today. But that doesn't change that the government had to show that the forms were submitted to Medicare in order for this to be a conviction. Now the government will get up here in a few minutes and they will tell you that there's no requirement that the forms were actually submitted to Medicare in order to secure the conviction. And when they do that, they'll talk to you about the Barson case and the Emo case. Now Barson is a very easy case to follow. Emo is a little more difficult. But what these cases say in the end is that the person didn't have to personally submit the documents to Medicare. Someone else could have done it on their behalf, but it doesn't alleviate the requirement that the forms were in fact submitted to good Medicare . . . . . . why couldn't a jury infer in the regular course of things that once documents are signed that in the regular course of things they are submitted? I mean why would the reverse inference have to be . . . in other words, in the totality of the evidence, why couldn't a jury infer signed it for purposes of submission in the regular course of things it was submitted? . . . Sure, Judge Stewart. I think absolutely that would be the case if the evidence showed that. If the evidence was in my law office, I sign something, I give it to my paralegal, she files it. It's what happens every single time. I don't know how to file. And if that was the same and that evidence was here, I think you could reach that inference. But the argument in the briefing isn't that. And the argument, and I think in the evidence and in the four-week trial, was whether or not he actually submitted them. And I think when we look to the case law, the case law turns on this point of whether or not he personally submitted it. That's the Emo case and the Barson case. Now I think when the court reads Emo, it's really important to go back to Girard because Emo says effectively what the government wants it to say, and that is that you don't . . . it doesn't have his personal requirement in it, but it cites to Girard, and Girard says that the defendant need not have personally submitted the form to Medicare. Now, I'm going to skip our argument on obstruction of justice and the sufficiency there, rely on the brief in my last two minutes, and turn just to the jury charge issue. And the argument here is jury charge enlarged the manner in which the jury could convict the appellant, and we made this really in two ways. The first is that the indictment alleged the investigative agency was CMS, the Center for Medicare and Medicaid Services, but the charge allowed for that to be . . . that investigation to have come from any governmental agency. We made a second point, but I think the government is right on that one on waiver. But on our first point, the one I've just discussed, I think the government is wrong. The government contends we've waived that on the doctrine of invited error, and I point the court to ROA 853 and ROA 1165, and I recognize this is a 23,000 page record, but I think if you compare ROA 853 and 1165, you'll see that the invited error doctrine doesn't apply. And it doesn't apply because the request made by the defense counsel in their charge on 1165 says that CMS was the investigative agency, but the charge that was given allowed it to be any investigative agency. So it expanded it from just CMS to any governmental agency. Now, the charge that was given does, in fact, say that an investigation by CMS would constitute an agency proceeding, but the charge does not limit it to a finding that CMS did the investigation, and you'll find that under the elements at ROA 1165. You're arguing the charge is too broad? We're arguing that the charge was expanded from what was in the . . . impermissibly expanded from what was in the indictment. What's your best case that the charge as given was reversible error? Sanders. And we've cited that and explained it in our brief, and I realize I'm out of time, but we'll refer to the court to Sanders in our brief. Thank you for hearing us this morning. Thank you, counsel. May it please the Court, my name is Gary Utterson. I represent Dr. Hergy in this case. I want to make a few points concerning the case against Dr. Hergy, and to begin with, I want to talk about the big picture of what this prosecution was about. As the court knows, the issue here was concern, hospice care by a company called Novus that was owned by a man named Bradley Harris who pled guilty and was the government's primary witness against the defendants that are here in front of you today. Part of the government's theory and probably really the main government's theory as it concerned the doctors like Dr. Hergy were that they were allowing Bradley Harris who was not a medical professional to put whoever he wanted into his hospice company in order to make money off of the hospice money that was being paid by Medicare. The answer to that question as to whether or not Dr. Hergy did that is contained, and this is all in our brief, but I want to highlight it, is contained in a series of text message exchanges between Bradley Harris and Dr. Hergy where Bradley Harris was giving Dr. Hergy a list of people who he wanted her to approve to go into hospice so that his company could bill and make money off of that hospice. Dr. Hergy responded to him in a text message, this is crazy. None of these patients are hospice appropriate. They are walkie talkie and in good health. Walkie talkie meaning they were moving around and talking and they were clearly not hospice appropriate. So she was taking that list and telling him no, which is exactly what the government claimed was her part in the conspiracy which was to do what he asked her to do. She also said in this series of exchanges by text to Bradley Harris, this is crazy. None of these patients are hospice appropriate. So she was going back and forth with him, telling him she was not going to put anybody into hospice who was not appropriate for hospice. She also said you will be in trouble with Medicare if you admit them. I don't know why you're telling me to admit them. And then shortly after this exchange she had with Bradley Harris, Dr. Hergy quit working at Novus and this was long before the FBI came in with their investigation. So the first point I want to make is that the whole theory behind the government's prosecution of Dr. Hergy is really invalid because she was not part of an agreement or conspiracy to put people into hospice who were not appropriate for hospice. Whether Bradley Harris did that, whether somebody else did that, whether another doctor did that, the fact is Dr. Hergy did not do that. Now, there's a couple of more specific things that the government has spent a lot of time on with Dr. Hergy. The face-to-face visits, the question is whether or not she saw patients when she was doing that she was required or a doctor was required to see a face-to-face basis after they had been in the hospice care for 180 days if they were still alive and they still needed to continue in hospice care. Dr. Hergy made a mistake on some of the dates that were on the forms that were submitted to support the fact that she saw people on a face-to-face basis. The government's theory was that Bradley Harris told her what dates to put on a form in order and the dates he picked were dates when she was in the facility where the patients were anyway and he picked those dates and said use those dates because nobody will be able to tell whether you actually saw the patient or not. Some of these dates, it turns out, she was on vacation out of state. So clearly she did not reach an agreement with Bradley Harris to use a false date in support of the date she saw the patient on the face-to-face visit because she was out of town. So it would make no sense that that was part of an agreement. I believe I'm out of town, so thank you. May it please the court, counsel. I have the honor, my name is Chad Van Cleave. I have the honor of representing Mrs. Tammy Little in this case, a court-appointed attorney under the Criminal Justice Act. So I just want to say how much I appreciate the opportunity, especially the honor it is to talk to you all here today. My client's situation is unique in my practice in that she's out, finished her sentence of confinement. She's on home confinement now, doing great and is able to be here with us today. And so our primary points that deal with the change in the length of the sentence have very little bearing on her situation. Although I'm prepared to address all of those, the practical matter is she is working. She is proving herself to be a law-abiding member of society who's working and paying taxes, and the amount of the restitution really is going to affect her. The court will probably note that originally in the first pre-sentence investigation report, the loss amount was given as $1.3 million in change. With a little bit of effort, the restitution pre-sentence investigation report author was able to understand that it was certainly no more than $366,000. So $1 million that was originally there went away. By the time of Ms. Little's supplemental objection to the pre-sentence investigation report, that is found at the record 21,299 . . . 29 in the following 30 pages, the last of which is the detailed spreadsheet of trial and sentencing counsel's calculations of loss amount offsets and credits. The appropriate amount of the loss should have been calculated to be $154,557.80. Specifically, the argument made, asserted to the sentencing judge in that supplemental objection was the holding of Mahmoud, which is a Fifth Circuit case from 2016, which says that the loss amount must account for the fair market value of the services rendered by the defendant or other persons acting jointly with the defendant to the victim before the defendant was detected. This spreadsheet was provided to the judge at sentencing in which credits were calculated and set before the court for fair market value of the services rendered. The court apparently completely disregarded the calculation as it was intended to be submitted and all the arguments that had to do with this $200,000 loss amount difference. The court's also aware, of course, that the government or the judge is only required to give a reasonable estimate of the loss amount when settling on a loss amount, but it has to be reasonable, and it's certainly not possible that a reasonable estimate would differ by 60%, 154 versus 366. Your argument about the offset was predicated on two things, that there were some patients who died before the Brexit period, and then some other patients who would have been entitled. I mean, is that after the initial reductions getting down to the $300,000, you're arguing that there should have been an additional offset for those? The additional offset was for patients who received care on hospice who were allegedly not hospice eligible, but the amount of the fair market value determined by the services that they did receive, which they could have received under home health. That figure was used for those patients. What do you say the amount should be now if the offsets you're urging were there? What would the amount be? $154,557.80. That's the amount that was submitted to the court, which was $154,557.80. We didn't get the benefit of the court saying, I'm not going to give an offset for those because, which reason could have been evaluated on appeal, could have also been clarified at that point, but we don't have that. We do believe that it was not reasonable to settle on an amount without even addressing the offsets that were put forward for consideration. This, of course, has effects on the sentence itself, the $366,000 loss amount. What are you requesting from the panel? Assuming you were correct, you're seeking a remand back to the district court to consider the offset? Is that what you're asking? To the extent that the court cannot on its de novo review just make that change and make the change to the sentence. What we would be asking for is a reduction to that amount however we have to arrive there, as well as the sentence to be changed. Guidelines, because of the $366,000 . . . I'm seeing, taking your argument, additional offset due to people who died or other people who might have been entitled, just trying to focus on how would we as a plenary matter, assuming we were to conclude you're right, how would we as a plenary matter sort of work through the mechanics of that to say, yes, it's right, and that's why I ask you, what relief you're seeking, is it a remand back to the district court to re-figure this or not? That's all. That would be great unless it could go back on remand with instructions to the properly found guideline amount of $154,000. I'm sure the government has a point of view about it, so we'll . . . I expect so, Your Honor. Moving on to . . . oh, and so the difference that it makes to the sentencing guidelines is $366,000 lands her at a bump of 12 levels. At $154,000 she would only get 10, her guideline range would change by 2. Each of the other issues . . . oh, sorry. Thank you. Thank you, counsel. Good morning. Jonathan Bradshaw on behalf of the United States. May it please the Court, Medicare is a system based on trust. In the context of a hospice, Medicare trusts that a hospice will only enroll patients who are truly deserving, that is, the terminally ill. And while Medicare trusts that hospice providers will comply with its rules, it enforces those rules in two very important ways. First, Medicare requires a hospice appoint a medical director who certifies a patient who comes on service as terminally ill. And second, once a patient has lived longer than 180 days, then before that patient can be recertified, Medicare requires that a medical director visit with that patient face-to-face, examine them, lay hands on them before recertifying that patient as terminally ill. Bradley Harris ran a hospice that flagrantly abused Medicare's trust. He worked with corrupt doctors, Dr. Gibbs and Dr. Hergy, to violate those two rules that I just told you about. The evidence showed that Dr. Gibbs and Dr. Hergy would pre-sign certificates of terminal illness without having seen a patient or paperwork supporting that certificate. And they would lie, claiming they had completed face-to-face visits when they had not. And those certifications would be used to support further bills for Medicare. Now, Bradley Harris' scheme involved targeting low-acuity patients, patients he testified would, quote, live longer, those that would not die quickly, because patients who died quickly were simply not profitable. And his law created a cap problem. Now, Medicare caps the total amount it will pay a hospice. And that cap is derived in part by the average amount of days that a patient's hospice stays on its census. In order to fix his cap problem, Brad Harris, Tammy Little, and a person named They mined another company's electronic medical records database in search of people who they could claim were hospice eligible. Then Tammy Little went out and marketed that hospice to them, lying to them about the very nature of hospice. And then, after 90 days, they would simply be unenrolled from Novus' rolls and thereby help Brad Harris' cap problem. All of that fraud didn't just cost Medicare. There was also a human cost in this case. There was patients like Warren Venable, whose daughters sent messages repeatedly to Novus asking that Novus send a doctor to visit their mom. They wouldn't do it. The daughter testified at trial that at no point when her mom was on hospice with Novus did a doctor come and visit her mother. Even so, Dr. Gibbs made $150 for certifying that he had done a face-to-face at her house. Dr. Hergie made $300 certifying that she had done two face-to-faces at Warren Venable's house. In addition, there was a patient like Susan Dorst, who my friend on the other side mentioned. Susan Dorst was not hospice eligible. Her primary care physician recommended that she get home health care. When an aide showed up from the home health care company who also worked at Novus, she simply decided to enroll her on Novus hospice. And instead of getting the curative treatment that she needed, she was now put on palliative care for no reason at all. Now, at this month-long jury trial, the government presented 16 witnesses, including Bradley Harris, Melanie Murphy, and two other co-conspirators who directly implicated each of these defendants in their fraudulent scheme. With the time that remains, I'd like to talk about the evidence briefly that supports each defendant's convictions on counts one. Thereafter, I'll be happy to answer any questions the court has, but I would like to turn to Defendant Little's argument about the loss amount. Turning first to Hergie, there are three pieces of this record. Actually, there are many pieces of this record that support Hergie's guilt, but there are three pieces that I want to mention. First is Hergie and co-conspirator Harris about pre-signed orders. Second is Harris' testimony showing Hergie's eager participation in a scheme to lie about completing face-to-face certifications. And third is Melanie Murphy's testimony, also showing that Dr. Hergie lied about completing face-to-face exhibits. Taking those in turn, Melanie Murphy testified that she, before Dr. Hergie's IDTs, Melanie Murphy would prepare blank folders full of blank documents for Dr. Hergie to sign. On one or two occasions, Melanie Murphy took that blank folder to Dr. Hergie. Dr. Hergie, without asking any questions of what was in there, simply signed the forms. At ROA 1883, Melanie Murphy described how those forms included verbal admit orders. Those are the orders that are used to admit a patient to hospice. Those orders, as you can see in Government's Exhibit 145 as an example, include a certification of eligibility. It says, in my best medical judgment, I certify that this patient is terminally ill with a life expectancy of six months or less if the disease runs its expected course. I have conferred with the following team members, and we have agreed to this plan of care, and that the patient named here meets its criteria for hospice admission. That form was pre-signed. There was no patient. There was no supporting paperwork. A jury could easily infer that Dr. Hergie was involved in this conspiracy to defraud Medicare by pre-signing those verbal admit orders. Even more was the face-to-faces. As I mentioned, the Lorraine Venable example, there is testimony in the record that Dr. Hergie never saw Lorraine Venable, but there are two face-to-faces in the record. There are the Government's Exhibit 1418 and 1416 showing that Dr. Hergie certified that she had done a face-to-face on Lorraine Venable. And then there are the batches of face-to-faces that Melanie Murphy or Brad Harris would send to Dr. Hergie with instructions on where she supposedly saw this patient and dates on telling her when to date the form. And from all of that evidence, this jury could amply conclude that the visits never happened, that she was lying about doing the face-to-faces. And for each of these fraudulent face-to-faces, she was paid $150 apiece. There was testimony from Brad Harris that Dr. Hergie and her husband viewed that $150 as a way for her to make extra money. So when she signed 37 face-to-faces, she had been making more than $5,000 claiming that she had seen patients when she had not. All of that evidence amply supports Dr. Hergie's guilt. Moving to Dr. Gibbs. Again, I want to point to three parts in the record. First, Murphy's testimony about handing Dr. Gibbs folders full of blank documents to sign. Second, Harris' testimony that after IDTs, Dr. Gibbs would come in his office, sit there, and they would fill out face-to-faces and batch. And then the third is the recorded conversation in which after the gig is up at Novus, Melanie Murphy records as Gibbs and the Harris' hatches scheme to move all of their operations to Dependable. Melanie Murphy testified that she went to 20 to 25 meetings a year for Dr. Gibbs. This is at ROA 1879. Her entire purpose for going to those meetings was to take a manila folder full of documents for Dr. Gibbs to sign. She would simply look at them, sign them, hand them back to her. As with Dr. Hergie, those documents included verbal admin notes, a certification of terminal illness for a patient that Dr. Gibbs had never seen or that no paperwork had been submitted. She would also sit in Brad Harris' office after IDTs and bulk sign face-to-face forms. And Brad Harris said we always picked a Thursday, that way the government could not disprove that Dr. Gibbs hadn't done the visits. And we would sit in my office, I would sit at my computer, and Dr. Gibbs would say, okay, what's going on with this patient? And so I would pull it up, tell him what's in the nurse's notes, he would fill out the face-to-face in front of me and sign it. For each of those face-to-faces, Dr. Gibbs paid $150. And then third is the conversation that was recorded, which blatantly shows a corrupt intent. In this conversation, Dr. Gibbs is urging Melanie Murphy to join them at their next criminal venture. And he says, it seems like, I told my wife that if she's going to leave, she needs to get on with it, otherwise money's going to get real tight. That's at 2070. He also said to Melanie Murphy, my question is, is this kind of shady? And the answer is yes, absolutely. But we've worked in the gray area for years. Everybody does. Melanie Murphy believed that Dr. Gibbs was deeply corrupt at that point, as she testified at ROA 2063. From all of that evidence, this jury could easily conclude and rationally conclude that Dr. Gibbs joined a conspiracy to fraud Medicare. That leaves Defendant Little. To understand Defendant Little's role in this scheme, you need to harken back to what I said at the beginning about the cap problem. Brad Harris realized that he had a multimillion-dollar cap problem. And the way Medicare was going to solve that cap problem was it was going to either claw back payments it had already made, or it was going to stop future payments, creating a multimillion-dollar loss for Novus. So to solve that problem, Brad Harris worked with Tammy Little, and they got access to an electronic medical records database for a company called Express Medical. And they printed off face sheets for these patients for Express Medical, and Tammy Little and Brad Harris went and sat and mined through these patient face sheets to look for patients that could be enrolled on hospice. Now, all of that was done in violation of those patients' rights under HIPAA. And government's witness Laurie McMillan testified that complying with HIPAA is a basic requirement for a hospice. Had those patients not been, had those patients been knowingly found in violation of HIPAA, they would not, hospice, excuse me, Medicare would not have paid those claims. After they unlawfully found the patients, then they went about unlawfully recruiting them. Record testimony shows that defendant Little would simply lie to patients. She would call patients pretending to work for a company or a program called Secure Horizons and attempt to sell them on hospice with Novus. And Harris would incentivize her. There's text messaging in the record indicating that Harris would pay her $250 or $350 for every patient that she enrolled who they found through this database. And finally, they would, testimony shows that after these patients had been unlawfully found and unlawfully recruited, they were, these patients were ineligible. And they were summarily kicked off of Novus' roles after just 90 days. Brad Harris testified that that was to help with his cap problem. He would enroll these patients, bill Medicare for $13,000, kick them off at 90 days and thereby drive down the average number of days on his patient census. All of that evidence amply supports each of these defendant's guilts on count one. Turning briefly to the issue of offsets. Judge Stewart, I think you asked a good question which is, was there really two arguments for offsets? And I think the answer is yes. So the first, I think we start with a framework laid out in the mood. That the government showed that these patients who were found in violation of HIPAA and Medicare paid for those patients, that is the beginning number. So then we look to offsets from that. So the first way they attempted to get offsets was to say, well these patients were on hospice and they received some eligible service for hospice. Look, the government's witness at trial said some patients could live up to four years and so every person who died within four years necessarily got a benefit that Medicare would recognize. Now, I think the district court was correct to reject that argument. I don't think it was clear error to say that simply because someone lived four years necessarily means they were hospice eligible, especially given the way that they were found and mined and recruited. And so then the second argument is that, well, we sent nurses and we sent home health aides to perform services. And so even if we couldn't build these services as hospice, we could have turned around and built these patients under home health care. And to substantiate that argument, they have to show that Medicare would have paid those claims under home health care, but for the fraud. And they simply can't do so. As Little's counsel acknowledged at sentencing, there was not the documentation required to submit and be paid for a home health care claim for Medicare. I mean, home health care requires a similar face-to-face. It requires a plan of care. It requires the plan of care be updated every 60 days. None of that was in these patients' records because these were hospice patients, not home health care patients. Had they built these nursing services and attempted to get an offset for home health care, Medicare would have said these aren't worth the paper that they're written on. The district court heard all of this argument at sentencing. It asked the government for its position. It asked the counsel for its position. It had made clear that it had read all these pleadings.  The last issue I want to touch on is Hergy's Title 21 count. Hergy on count 14 was convicted of unlawfully distributing a controlled substance called hydromorphone. And the way that that distribution worked is Hergy would presign blank triplicates or blank prescriptions, and she would give them to Brad Harris or to Melanie Murphy. Melanie Murphy testified when she ran out of triplicates, she just simply had to text Dr. Hergy to get more. And it was not, Dr. Hergy, excuse me, then Melanie Murphy and Brad Harris would then direct patient care using those triplicates. So in count 14, it was charged that there was an unlawful dispensation to Lorraine Venable. And the way that that worked is Melanie Murphy gets a text message that says, hey, another nurse who's not on this text thread called in a prescription for hydromorphone. And Melanie Murphy, who is not a nurse, is not a doctor, says, okay, I know the standard amount of hydromorphone that doctors normally would prescribe. So she picks that prescription. And she testified to this. She put four mils at this time of day. And she, using a blank triplicate, signs it out, fills it out, Lorraine Venable, this amount, and then sends that off to the pharmacy. Now, we submit that we proved that both, that pre-signed prescription had no legitimate purpose, and it was far outside the usual course of professional practice. If the court has any questions, I see we used a lot of time, and I wanted to give you a chance to jump in. Well, to respond back to counsel's argument about the jury charge and the whole invited error. Sure. And just to be perfectly clear, this is the argument we heard this morning. There's two invited errors running around. So, on the, there was no constructive amendment on the . . . I'm sorry, you said what, no what? There was no constructive amendment on that issue. The jury was charged in typical fashion, consistent with this court's pattern instruction, to consider only the crime charge. And the jury was given a copy of the indictment to take back to the jury room with them. There was no evidence in this record, there was no testimony, this was not a trial about any other proceeding other than this agency proceeding that these defendants attempted to obstruct their suspension whenever Medicare suspended their payments for credible allegations of fraud. In other words, there's nothing in these instructions, and nothing in this evidence that would suggest in any way that the government broadened its theory of indictment. Our best case on that is the Griffin case, 2015, from this circuit. On the invited error part, they sort of made this argument in two ways. One was to say it could have been any proceeding, and I don't think they invited that error, but they also said you could obstruct by any of these different means. Well, that's exactly the instruction that they requested, and that's the point we said was invited error. Seeing no further questions, I'll cede the balance of my time. Thank you. Your Honors, at trial, the government said over and over again to the jury that Dr. Herjee by presigning prescription forms was allowing an accountant and an office manager to decide what drugs to give to patients, and that was a total, complete misrepresentation of the facts. What happened on this is when a patient was admitted into hospice, the doctors would decide a group of drugs that would be approved for this patient with the understanding that the purpose is to relieve pain and to provide comfort to a patient who's probably dying, and they would decide which drugs would be appropriate for those patients, and those would be the pre-approved drugs, and the nurses treating the patients would be given authority to operate under the parameters of the orders that the doctor had approved, pre-approved. Now, Dr. Herjee would pre-sign prescription forms because of the system that was set up, which, according to the testimony in the case, was common in hospice at this time. The nurse is with the patient. The nurse decides that the patient needs a particular drug that they don't have. The nurse calls the pharmacy and asks for the drug, and then the pharmacy calls the novice office, and the novice office would then use the pre-signed prescription, and understand this is only in the middle of the night when there's no doctor available. They would use the pre-signed prescription, which is for something that has already been approved for this patient as part of this patient's treatment, and that would result in the prescription quickly getting to the patient, understanding that speed is of the essence because these people are in excruciating pain, and you can't wait hours. Your client was attenuated from this process? She pre-signed the prescription form that was actually used in this process, but... Removed from what was actually going on? She was not removed. I don't think that's the way I would put it, because they used her, sometimes on some of these, they used her pre-signed prescription form, but it was always for drugs that had already been approved previously for this patient. So the accountant and the office manager, Bradley Harris, was not deciding what drugs to give these patients. It was being decided by the medical professionals. Were you trial counsel? I'm sorry? Were you trial counsel? No, sir, I was not. Bill Harris. Okay. Bill Harris. All right, thank you. I have a question. Yes. Were the patients that she pre-approved these drugs for appropriate hospice patients? There was no evidence at all that there were any inappropriate hospice patients. Every patient that was involved in this case, as far as Dr. Hergy goes, all of the evidence is they were appropriate for hospice. There is not one iota of evidence otherwise. All right, thank you, Your Honor. Your Honors, the two points I'd like to make. One of the points made, if I heard it correctly, was that the services rendered were not worth the paper that they were written on. We clearly would disagree that that's the case, but also would point out that the holding of Mahmood gives us quite a mathematical way to do it. Services were rendered. They had a fair market value. There should be an offset given for those services. We'd also like to just point out, since the government's argument today was quite heavy on Dr. Hergy, it became very, very clear in hindsight when the pre-sentence investigation reports were settling who was responsible for loss amounts. Joint and several liability was completely separate between Dr. Hergy and Ms. Little because their patients didn't overlap and their time with the company also did not overlap. Thank you.